[Cite as *State v. Brown*, 2013-Ohio-1099.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2012-L-007** |
| NATHANIEL S. BROWN, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 11 CR 000242.

Judgment: Reversed and remanded.

*Charles E. Coulson,* Lake County Prosecutor, *Alana A. Rezaee*, Assistant Prosecutor, *Karen L. Kowall,* Assistant Prosecutor, and *Mark J. Bartolotta,* Assistant Prosecutor, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Matthew C. Bangerter,* 1360 West 9th Street, Suite 200, Cleveland, OH 44113 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1}     Appellant, Nathaniel S. Brown, appeals from the judgment of the Lake County Court of Common Pleas convicting him of aggravated murder, aggravated robbery, kidnapping, felonious assault, and gross abuse of a corpse. For the reasons discussed below, appellant's convictions are reversed and the matter is remanded for a new trial.

**{¶2}** On Saturday, April 9, 2011, William Andrew Putzbach went to a party at his brother Erik's house with an acquaintance, Kyle Basinger. Putzbach and Basinger had a few drinks and mingled with other partygoers. Later in the evening, however, Basinger was acting strange, following people at the party for no reason and staring blankly at others. And after Basinger advised Erik he was an assassin, Erik asked Putzbach to take Basinger home. Putzbach complied, then returned to Erik's house where he remained overnight.

**{¶3}** On Sunday afternoon, Putzbach, accompanied by Basinger, went house hunting with his friend, Nicole Knecht. While walking through the house, Nicole overheard the two men talk about plans they had later that evening. According to Nicole, the two men were friendly and were getting along fine.

**{¶4}** On Sunday night, Basinger was with appellant and Ronald Shirer at appellant's and Shirer's apartment, in the Willoughby Hills Towers, playing video games. Basinger used Shirer's phone to call Putzbach to set up a marijuana deal. Surveillance cameras on the 12th floor of the apartment building captured appellant, Basinger, and Shirer walking from appellant's apartment toward an elevator. Basinger had a roll of duct tape around his right forearm.

**{¶5}** The three men proceeded into the parking lot of the complex, where they found Putzbach in his vehicle. All three entered the vehicle; Shirer sat in the front passenger seat, Basinger behind Putzbach, and appellant in the backseat of the passenger side. After a brief discussion, Basinger brandished a chain and looped it around Putzbach's neck. Putzbach struggled but, due to the tightness of the chain, was unable to speak. Basinger eased the pressure long enough for Putzbach to give the men his ATM personal identification number, then reapplied the pressure. Putzbach

2

struggled to loosen the chain, but was pulled into the rear of the vehicle. According to appellant, Basinger released the chain, produced a claw hammer, and repeatedly beat Putzbach in the head until he stopped moving. Basinger then bound Putzbach's hands with the tape and took his wallet and phone.

{¶6} Basinger, with appellant in the passenger seat, left the apartment complex in Putzbach's car. Shirer followed in his vehicle. Putzbach remained in the backseat of his vehicle, bound, bleeding, and motionless. They drove to Kirtland, Ohio, where Shirer filled up his gas tank using cash stolen from Putzbach. The group then drove to Willoughby Hills where they pulled into a metropark where, according to appellant, Basinger discarded various items from Putzbach's trunk. Appellant stated Basinger then moved Putzbach from the backseat to the trunk. The men eventually returned to appellant's apartment.

{¶7} Bank records revealed that two unsuccessful attempts were made to withdraw money from Putzbach's account that night. The records further demonstrated the attempts were made from an ATM located near the Willoughby Hills Towers apartment complex.

{¶8} Over the next several days, Basinger continued to drive Putzbach's vehicle. He and Shirer also made multiple purchases from Walmart using Putzbach's stolen credit card. After Putzbach was reported missing from work on Monday and Tuesday, April 11 and 12, an investigation was initiated. Using bank and cell phone records, as well as surveillance footage from Walmart, Basinger and Shirer became suspects.

{¶9} On April 18, 2011, officers went to the Willoughby Hills Towers to question Shirer regarding Putzbach's whereabouts. As they entered the complex, they

3

immediately noticed Putzbach's 1995 Pontiac Grand Am in the parking lot. They peered inside the vehicle and observed the back seat was completely covered with a comforter; they also noticed duct tape in the vehicle's back window. Given the pending investigation, officers began to process the vehicle.

{¶10} Upon opening the vehicle's trunk, officers discovered Putzbach's beaten, bound, and bloodied body, face down. As their search progressed, officers discovered a significant amount of blood in the back seat. They also recovered a four-foot-long, linked chain and a blood-stained roll of duct tape. Appellant and Shirer, who were both in their apartment, were immediately arrested and taken into custody. During a subsequent search of the apartment, officer's seized a hammer of which appellant acknowledged ownership. On the same day, officers recovered Putzbach's belongings from the metropark at which they were discarded a week earlier.

{¶11} Blood-spatter analysis was conducted on the interior of Putzbach's vehicle by forensic scientist, Curtiss Jones. Jones opined that the spatters, located on the interior surface of the rear-passenger window and door, came from multiple impacts. He further opined that the blood source was located in the rear passenger compartment at the time of the impacts. And, given the circular to oval shape of the spatters, the source would have been situated at approximately the same height of the window.

{¶12} Dr. Stephen LaBonne, DNA technical manager at the Lake County Crime laboratory, conducted DNA testing on the hammer. The hammer tested presumptively positive for the presence of blood. After further testing, Dr. LaBonne opined the blood included a mixture of DNA. He testified, however, he could not, within a reasonable degree of scientific certainty, draw an affirmative conclusion regarding the source of the

4

DNA. The doctor simply testified neither appellant nor Putzbach could be excluded as contributors.

{¶13} During his interview with police, appellant admitted to being in the vehicle when Putzbach was murdered. He denied, however, any participation in the assault. He told police that Basinger single-handedly strangled, beat, and bound Putzbach. Appellant also stated Basinger, by himself, removed Putzbach's body from the back seat of his car to the trunk.

{¶14} June 14, 2011, the Lake County Grand Jury indicted appellant on two counts of aggravated murder, in violation of R.C. 2903.01 (Counts One and Two); six counts of murder, in violation of R.C. 2911.01(A)(3) (Counts Three through Eight); one count of aggravated robbery, a first degree felony, in violation of R.C. 2911.01(A)(3) (Count Nine); two counts of kidnapping, first degree felonies, in violation of R.C. 2905.01 (Counts Ten and Eleven); two counts of felonious assault, second degree felonies, in violation of R.C. 2903.11 (Counts Twelve and Thirteen); and one count of gross abuse of a corpse, a fifth degree felony, in violation of R.C. 2927.01 (Count Fourteen). Appellant pleaded not guilty.

{¶15} A jury trial commenced after which appellant was found guilty on all counts. For purposes of sentencing, the trial court merged Counts Two through Eight into Count One; Count Eleven into Count Ten; and Count Thirteen into Count Twelve. Appellant was then sentenced to life imprisonment without the possibility of parole on Count One; the court further sentenced appellant to nine years imprisonment on Count Nine, nine years imprisonment on Count Ten, seven years imprisonment on Count Twelve, and 11 months imprisonment on Count Fourteen. The sentences were ordered to be served concurrently.

{¶16} Appellant now appeals and assigns eight errors for our review. His assignments of error shall be addressed out of order.

{¶17} Appellant's third assignment of error reads:

{¶18} "The trial court erred to the prejudice of the defendant-appellant when it allowed a lay witness to offer an expert opinion."

{¶19} Appellant argues the trial court erred in allowing the scientific testimony of two of the state's witnesses without making the threshold determination that the witnesses were experts. Again, no objection was made at trial to the trial court's failure to declare these witnesses experts on the record. Thus, appellant has waived all but plain error on this issue.

{¶20} Multiple appellate courts in Ohio, including this district, have concluded that a trial court need not expressly state a witness is qualified as an expert before the expert offers opinion testimony. *State v. Waskelis*, 11th Dist. No. 2011-P-0035, 2012-Ohio-3030, ¶64; *State v. Webb*, 6th Dist. No. L-90-280, 1991 Ohio App. LEXIS 5482, (Nov. 15, 1991); *State v. Skinner,* 2d Dist. No. 11704, 1990 Ohio App. LEXIS 4178, (Sept. 26, 1990); *State v. Wash*, 1st Dist. No. C-950371, 1996 Ohio App. LEXIS 1441, *15 (Apr. 10, 1996). Thus, as long as the record demonstrates no abuse of discretion in allowing the testimony, a reviewing court will not disturb expert testimony "simply because 'magic' words do not appear on the face of the record. *Skinner*, *supra*.

{¶21} Pursuant to Evid.R. 702, a witness may testify as an expert if "[t]he witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons, * * * [t]he witness is qualified as an expert by specialized knowledge, skill, experience,

6

training, or education regarding the subject matter of the testimony," and "[t]he witness' testimony is based on reliable scientific, technical, or other specialized information."

{¶22} Curtiss Jones, Supervisor of the Trace Evidence Department at the Cuyahoga County medical Examiner's Office, testified as an expert in bloodstain and blood-spatter analysis. Mr. Jones listed his educational and professional credentials in open court which were unchallenged by defense counsel; in fact, defense counsel acknowledged Mr. Jones as an expert on record. And the record discloses Mr. Jones' testimony and opinions regarding the blood spattering on the interior rear passenger door and window of the victim's car were based upon his education, training, and experience in bloodstain pattern interpretation. Mr. Jones' testimony related to a specialized knowledge beyond an average person's knowledge and nothing in his testimony suggests the methods he employed were unreliable.

{¶23} Dr. Stephen LaBonne, DNA Technical Manager at the Lake County Crime Laboratory, testified as an expert in DNA analysis based upon his education, qualifications, and training. Like Mr. Jones, Dr. LaBonne's credentials and professional background were put on record and went unchallenged by defense counsel. Dr. LaBonne described the tests he conducted on the chain as well as the hammer and testified to the test results. The tests and analyses were beyond the ken of the average juror, relevant to the prosecution, and there is no indication the methods used by Dr. LaBonne were suspicious or unreliable.

{¶24} Given these points, we hold the trial court did not abuse its discretion in admitting both Mr. Jones' and Dr. LaBonne's expert testimony. The state laid an adequate foundation for the testimony of both of the witnesses; and their background,

7

skills, and opinions meet the requirements of Evid.R. 702 and the trial court's failure to explicitly declare them experts on the record is not plain error.

**{¶25}** Appellant's third assignment of error is without merit.

**{¶26}** Appellant's fourth assignment of error asserts:

**{¶27}** "Defendant-appellant was denied effective assistance of counsel in violation of the Sixth Amendment of the United States Constitution."

**{¶28}** To establish ineffective assistance of counsel, an appellant must show that his attorney's performance was deficient and that the alleged deficiencies prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Both the performance and prejudice prongs must be established to demonstrate counsel's ineffectiveness.

**{¶29}** An attorney's performance is deficient if, after considering the totality of the circumstances, his or her representation fell below an objective standard of reasonableness. *Id.* at 688. A court, however, "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Debatable trial tactics do not generally constitute deficient performance. *State v. Phillips*, 74 Ohio St.3d 72, 85, (1995) citing *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980).

**{¶30}** With respect to the prejudice prong, an appellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland, supra*, at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.*

**{¶31}** Appellant first contends his trial counsel was ineffective when he failed to object to the testimony of Curtiss Jones, the state's blood-spatter expert. Appellant

8

asserts the witness was not an expert and his credibility was enhanced when defense counsel openly recognized the witness as an expert.

**{¶32}** As discussed under appellant's third assignment of error, the trial court did not abuse its discretion in accepting Mr. Jones' expert testimony. Both his credentials and his testimony met the requirements of Evid.R 702. And, moreover, although defense counsel acknowledged Jones as an expert, this recognition was likely placed on record for the jury to hear, on cross-examination, that, according to the state's expert, the spatters did not undermine appellant's innocence defense. We find no error in defense counsel's approach to examining Mr. Jones.

**{¶33}** Next, appellant contends his trial counsel was ineffective for failing to contest the admission of the blood-spatter testimony pursuant to *Daubert v. Merrell Dow Parmaceuticals*, 509 U.S. 579 (1993). Appellant essentially contends that counsel was ineffective because he did not contest the reliability of blood-spatter analysis.

**{¶34}** A trial court does not err by allowing a blood-spatter expert to testify without holding a *Daubert* hearing. *State v. Crawford*, 1st Dist. No. C-70816, 2008-Ohio-5764, ¶64. Further, the Supreme Court of Ohio has repeatedly acknowledged that blood-spatter analysis and testimony regarding that analysis is a proper subject for expert testimony. *State v. Biros*, 78 Ohio St.3d 426, 452 (1997); see, also, *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶56. Thus, even had counsel moved to exclude Jones' testimony, such a motion would have been unsuccessful. Counsel's performance cannot be deemed deficient under these circumstances.

**{¶35}** Appellant next asserts trial counsel was ineffective when he failed to object to alleged prejudicial statements included in the video of his interrogation that was played for the jury in its entirety. Prior to the video being introduced, the

9

interrogating officer was examined by the prosecutor to place the interrogation in its proper context. The officer testified how appellant's story had evolved from not being present during the murder to being a witness to the murder. And, even though appellant denied involvement throughout the interview, the officer testified appellant's tone and demeanor went from strident denial to "very sullen, very quiet" as the interview progressed. The jury was subsequently permitted to review the appellant's interview.

{¶36} During the interrogation, the following exchange took place between appellant and Willoughby Hills police:

{¶37} [Officer:] Here's the deal: Willowick detectives are talking to Ron right now, okay?

{¶38} [Appellant:] Uh-huh.

{¶39} [Officer:] And you know what Ron's telling them?

{¶40} [Appellant:] No.

{¶41} [Officer:] Ron's telling them that you helped carry the body from the back seat to the trunk.

{¶42} [Appellant:] That's not right.

{¶43} [Officer:] He said that you had the shoulders/head area, Kyle had the feet and Ron had the middle torso. And you guys all helped carry it and put it into it. As a matter of fact, Ron even said that you actually had the head and it kind of slipped and it went down your shirt and onto your shorts. So - - but you didn't drop it, I mean, it fell on you but you - - it hit your leg, you picked it up, and you put it in the trunk. You put the body in the trunk.

10

{¶44} [Appellant:] Then wouldn't my fingerprints be on the shoulder area or whatever?

{¶45} [Officer:] I'm assuming so.

{¶46} [Appellant:] They won't be, because I didn't touch that body. I never assisted him with it.

{¶47} Appellant argues that permitting the jury to view the video of the interrogation was prejudicial because it included inadmissible hearsay as well as statements that were uncorroborated by independent reliable evidence. Appellant also notes that one of his interrogators stated that the authorities had a video that implicated appellant in the murder. Appellant contends this statement was false and therefore highly prejudicial to his defense.

{¶48} First of all, the statement by the officer that appellant was on video was accurate and supported by additional independent evidence. The state introduced pictures from the Willoughby Hills Towers' security camera depicting appellant, Basinger, and Shirer leaving the 12th floor of the apartment building on the night of and just prior to Putzbach's murder. Although the statement may have been prejudicial, as all evidence against an accused is, it was not unduly prejudicial. Thus, we find no error in permitting the jury to hear the interrogator's statement vis-à-vis the video.

{¶49} Moving on to the officer's representation that appellant's co-defendant had implicated appellant. Appellant asserts the statements made by the officer were inadmissible testimonial hearsay which violated his Sixth Amendment right to confrontation. For the reasons that follow, we agree with appellant's argument.

{¶50} The Confrontation Clause prohibits the admission or use of testimonial statements of a witness who does not appear at trial unless that witness is unavailable

11

to testify, and the defendant has had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The Sixth Amendment right to confrontation, however, may only be invoked under situations where hearsay is offered into evidence. *Id.* at 60, n. 9. The United States Supreme Court has held that a defendant's right to confrontation is violated where the state offers, for their truth, any portions of statements of a co-defendant made to police that directly or indirectly inculpate the defendant. *See Bruton v. United States*, 391 U.S. 123 (1968). The statements, however, *must* be hearsay to trigger the *Bruton* rule. *See e.g. Crawford*, *supra*. ("[t]he [Confrontation] Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.")

**{¶51}** With these guiding principles, we first consider whether the interrogation statements at issue were testimonial. In the consolidated cases of *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813 (2006), the United States Supreme Court observed:

> **{¶52}** Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Id.* at 822.

**{¶53}** There was no ongoing emergency in this case. It follows, therefore, that the statements made in the course of the interrogation at issue were testimonial. We

12

must next determine whether the statements at issue were hearsay such that appellant's right to confrontation was triggered.

{¶54} Hearsay is a statement, other than one made by a declarant while testifying, offered to prove the truth of the matter asserted. Evid.R. 801(C). The state contends the statements in the interrogation video were not hearsay because they were merely designed to elicit a reaction from appellant. Hence, the state maintains, they were not offered to prove the truth of the matter asserted.

{¶55} Although the state's position is facially reasonable, our analysis does not end with this conclusion. Even if the statements were offered to merely demonstrate their effect on appellant, we must still consider how appellant's reactions were probative of an issue of consequence. Because a defendant's reactions during a police interrogation, unto themselves, are irrelevant absent a context in which a fact-finder is able to evaluate them, we find that the only relevance appellant's reactions could have was to offer proof of the truth of what the officer was asserting during the interrogation; namely, that Shirer told police appellant was involved in the murder.

{¶56} While, in the abstract, a statement offered to show its effect on a listener is permissible, non-hearsay evidence, reactions, particularly those relating to the statements of another, cannot be considered in a vacuum. Appellant's reactions, consequently, only have content within the context of the statement the officer has made. And the effect of the statements is relevant only to the extent it elicited a reaction *to support the truth of the matter asserted*. Thus, the effect or reaction is necessarily based upon the officer's representation that the statement, as offered, is true.

13

{¶57} Just as the officer could not personally testify that Shirer, in a separate interrogation, implicated appellant in the crime, we decline to endorse the state's attempt to introduce similar evidence by way of video. Allowing the state to do so would validate the introduction of otherwise inadmissible evidence and inherently compromise the fundamental fairness of the judicial process. We therefore conclude that the officer's statement was hearsay that, in this case, implicated appellant's right to confrontation.

{¶58} Given this conclusion, we must examine the legal implications of introducing the officer's statement. As alluded to above, the admissibility of statements made or allegedly made by a non-testifying codefendant is governed by the United States Supreme Court's decision in *Bruton*, *supra.* In that case, codefendants, Evans and Bruton, were jointly tried on charges of armed postal robbery. A postal inspector testified that Evans confessed to the crime and told him that Bruton aided him. Evans, however, did not testify at trial and, as a result, Bruton did not have an opportunity to cross-examine Evans regarding the confession. The trial court instructed the jury that the confession was admissible only against Evans, but could not be considered in determining Bruton's guilt as it was inadmissible hearsay. Bruton and Evans were convicted.

{¶59} The Supreme Court of the United States reversed Bruton's conviction, holding that, notwithstanding the limiting instruction, there was a substantial risk that the jury still looked to the incriminating extrajudicial statements in determining Bruton's guilt in violation of his right to confrontation. *Id.* at 126; 137. The court acknowledged "the impossibility of determining whether in fact the jury did or did not ignore Evans' statement inculpating [Bruton] in determining [Bruton's] guilt." *Id* at 136. According to

14

the court, however, the substantial threat to Bruton's constitutional right to confront a witness whose potentially unreliable statement was introduced against him was a problem that could not be ignored. *Id.* at 137.

**{¶60}** The rule in *Bruton* may be expressed as follows: Any statement made by a non-testifying codefendant that serves to inculpate an accused is a violation of the accused's constitutional right to confront adverse witnesses and such statements must therefore be excluded from evidence. *See e.g. State v. Yeager*, 9th Dist. Nos. 21091, 21112, 21120, 2003-Ohio-1808, ¶16.

**{¶61}** In discussing the scope of *Bruton*, the Supreme Court of Ohio has observed:

**{¶62}** "[T]he *Bruton* rule applies with equal force to all statements that tend significantly to incriminate a co-defendant * * *. The fact that the incrimination amounts to a link in a chain of circumstances rather than a direct accusation cannot dispose of the applicability of the *Bruton* rule. Just as one can be convicted on circumstantial evidence, one can be circumstantially accused." *State v. Moritz*, 63 Ohio St.2d 150, 153, quoting *Fox v. State*, 384 N.E. 2d 1159, 1170 (Ind. App. 1979).

**{¶63}** A *Bruton* problem will arise, consequently, when the trial court admits into evidence a non-testifying defendant's statement that implicates the other defendant in criminal activity. And, pursuant to the Supreme Court's observation in *Moritz*, *supra*, it also follows that a *Bruton* violation occurs where a trial court permits the introduction of evidence ascribed to a non-testifying codefendant that directly implicates the accused in the underlying crime(s). *Moritz*, *supra*. (*Bruton* applies to *all* statements that tend in a significant way to incriminate).

15

**{¶64}** Even if there is evidence of a *Bruton* violation, however, a reversal is only necessary where an examination of the evidence leads to the firm conclusion that a defendant's right to a fair trial was so jeopardized that a mistrial was required to meet the demands of justice. *Yeager*, *supra*, at ¶42; see, also *Moritz*, *supra*, at 153. (If evidence of guilt is so overwhelming that the prejudicial effect of the admission of a codefendant's statement was insignificant, the *Bruton* violation may be deemed harmless error.)

**{¶65}** In this case, the statement, ascribed to Shirer, specifically implicated appellant in the movement of the body but did not directly implicate appellant in the murder, robbery, kidnapping, or assault. It did, however, act as a "circumstantial accusation" that appellant was involved in the crimes despite his regular and continued protestations of innocence. Whether Shirer ever actually implicated appellant is immaterial. The admission of the statement permitted the jury to premise its verdict upon the incriminating, yet potentially unreliable, extrajudicial statement ascribed to Shirer without appellant having the opportunity to test Shirer in the crucible of cross-examination.

**{¶66}** We therefore conclude defense counsel rendered deficient performance in failing to object to the introduction of the portion of the video in which the interrogator told appellant Shirer had implicated him. To rise to a reversible error, however, counsel's failure to object had to cause appellant's defense prejudice, i.e., counsel's omission had to be sufficient to undermine confidence in the outcome of the trial. For the following reasons, we conclude appellant suffered prejudice.

16

{¶67} Although the state introduced some evidence implicating appellant in the attack, a review of the entire record fails to disclose overwhelming evidence of his guilt beyond a reasonable doubt.

{¶68} Before discussing the salient evidence upon which the state based its case, however, we must first address the impact of what the state asserts were "limiting instructions" regarding the interrogation video. Prior to giving the case to the jury, the court provided the following instruction: "A video recording and testimony relating to it have been introduced into evidence. You shall consider whether the video recording is a true record of what transpired at the time it was taken. If you find that it is, you will then determine what weight, if any, the video recording should receive in light of all the evidence."

{¶69} While this instruction directed the jury that it was entitled to give the video the weight it deemed appropriate, it did not advise the jury to disregard the content of the officer's statement that is the subject of the *Bruton* violation. Furthermore, the Supreme Court in *Bruton* specifically held that the heightened risk that a jury, despite instructions to the contrary, will rely upon the extrajudicial statement in rendering its verdict is sufficient to violate the Confrontation Clause of the Sixth Amendment. The instruction in this case was non-specific and therefore is completely inconsequential to our analysis.

{¶70} The evidence in this case demonstrated that appellant never admitted to knowing about a plan to rob or murder the victim. And he consistently maintained he was not involved in the attack. Rather, over the course of a lengthy interview, appellant routinely stated once Basinger commenced the attack, he was in shock and crouched into the rear passenger corner of the vehicle.

17

{¶71} Further, a hammer, which belonged to appellant, was eventually seized by police. DNA analysis was conducted on the hammer and results were ultimately deemed inconclusive. Dr. LaBonne specifically testified that he was able to recover two DNA profiles from the hammer. While he could not conclude to a reasonable degree of scientific certainty who the profiles belonged to, he testified neither the victim nor appellant could be excluded. In particular, Dr. LaBonne explained:

{¶72} In some cases if you have a very unequal mixture it's possible to separate that out as a major and minor components, because basically what I'm looking at is peaks on a plot and the heights of those peaks are pretty well proportional to the amount of DNA there was going in. In this case I had a fairly equal mixture of peaks that were all roughly in the same size range. All of the peaks associated with each of those two individual[s] was present. So, my evidence is most easily explained by being a mixture of Mr. Brown's and Mr. Putzbach's DNA. On the alternate hypothesis that it was either Mr. Brown or some other individual, or Mr. Putzbach and some other individual, those other individuals are quite rare in the population. I came prepared with a number. The smallest number out of the four population data bas[e]s that the FBI provides us is for the Caucasian population, and roughly 1 in 5 million unrelated individuals in the general population would be a possible alternate donors would explain that stain.

{¶73} The foregoing evidence, by itself, does not implicate appellant in the crime. Because he owned the hammer, it is unremarkable that a DNA profile from

18

which appellant could not be excluded was found on the tool. Moreover, the evidence demonstrated that Basinger was in appellant's apartment during the hours leading up to the murder. Hence, given appellant's story, one could reasonably conclude Basigner took the hammer from appellant's apartment without appellant's knowledge.

{¶74} The state, in its brief, points out that the ceiling of the vehicle, from the center to the far passenger side, show multiple impact marks which resemble the parallel edges of the top of a claw hammer. The state also emphasizes that appellant admitted to sitting in this area during the attack. The state maintains these points provide a circumstantial basis, along with appellant's acknowledged ownership of the hammer, that appellant, not Basinger, struck the victim with the hammer. Nowhere, however, did the state specifically establish that the marks on the vehicle's ceiling were actually made by a hammer or made during the attack. Furthermore, no blood or blood spatter was found on the vehicle's ceiling. And, even if the hammer created the indentations in the ceiling, it is not obvious how their location could be considered dispositive evidence of appellant's involvement. Regardless of appellant's placement in the vehicle, Basinger was not physically precluded from leaning toward the area where appellant was sitting to strike the victim with the hammer.

{¶75} Dr. Joseph Felo was the pathologist who conducted the autopsy on the victim. Dr. Felo testified, to a reasonable degree of medical certainty, that the victim was alive when he sustained the blows to the head. And, the doctor stated the blunt force trauma to the head was, unto itself, insufficient to cause the victim's death. Indeed, the autopsy revealed the victim's death was a result of asphyxiation, i.e., a cessation of blood to the brain. Dr. Felo further testified that death by asphyxiation occurs only with continuous pressure on the arteries supplying blood to the brain. If, for

instance, an individual's heart is still pumping and pressure around the neck is released or relaxed, the blood will resupply the brain and the individual could revive.

{¶76} Appellant's version of what happened is not inconsistent with the doctor's findings. Appellant maintained that prior to brandishing the hammer, Basinger let up on the chain. Appellant never stated Basinger dropped the chain while he struck the victim with the hammer and, as such, once the hammer was raised, Basinger could have tightened the choke anew. Thus, the medical evidence that the victim died of asphyxiation, but was not dead when the hammer blows were delivered, does not refute appellant's rendition of the attack.

{¶77} The state also places emphasis that the Willoughby Hills Towers' security camera depicting appellant, Shirer, and Basinger leaving to meet the victim in the parking lot just prior to the murder. The pictures show Basinger with a roll of duct tape around his arm. The state asserts the presence of the roll of tape on Basinger's arm would have alerted a reasonable person that something other than a drug deal was going to transpire. While this may be true, we fail to see how the presence of the duct tape on Bassinger's arm is enough to permit the inference that appellant had foreknowledge that an attack was about to take place.

{¶78} The only direct evidence of appellant's involvement came from a passing statement he made towards the end of his interview. As discussed above, appellant steadfastly and consistently maintained he had no involvement and had no foreknowledge of a plan to either rob or murder the victim. When appellant was asked by his interrogator to rehash the attack, appellant again stated Basinger, while still choking the victim, brandished the hammer and began to bludgeon the victim. Appellant further stated, however, that, as Basinger pulled the weapon from his pocket

20

"*we* had pulled the dude back;" a statement indicating he and Shirer had some involvement in the attack. This statement was not discussed, let alone emphasized, at trial by the prosecution.

{¶79} We recognize that the above statement was enough to submit the case to the jury; we cannot say, however, given appellant's otherwise repeated and aggressive denials of any involvement in the crimes, coupled with the paucity of supplementary direct, as well as circumstantial evidence, that the statement, by itself, was sufficient to overcome the prejudice appellant sustained as a result of the introduction of the challenged statement. Because of the substantial risk that the jury relied upon the inculpatory statement ascribed to Shirer in arriving at its verdict, we hold the admission of the statement violated appellant's right to confrontation secured by the Sixth Amendment. Counsel's performance, in this regard, was ineffective requiring reversal.

{¶80} Next, appellant draws this court's attention to additional testimony to which counsel failed to object which, he claims, materially prejudiced his defense. To wit, on direct examination, Detective Ron Parmertor testified that, during the search of appellant's home, he found 49 video games, most of which were of a violent nature. We agree that the detective's testimony regarding the violent nature of the video games is irrelevant. Without some expert testimony that violent video games negatively impact a person's behavior *and* evidence that appellant played the games in question, the detective's observation completely lacked foundation. And, on cross-examination, although the detective testified he had never viewed or played the games, he also testified that, through conversations with one of appellant's co-defendants, he had knowledge that appellant played the games. Introducing this testimony could have

21

foreseeably prejudiced the jury by urging it to believe appellant was either a violent person or desensitized to violence.

{¶81} This testimony, standing alone in a matter where the evidence militates strongly in favor of a conviction, would not likely undermine confidence in the outcome of the case. When considered in conjunction with the *Bruton* violation, however, we hold, in this case, this line of questioning, without objection, raises additional serious questions about the quality of the evidence upon which the jury based its verdict. We therefore conclude the admission of this evidence, when viewed together with the *Bruton* error, cannot be construed as harmless. We consequently hold counsel was ineffective for failing to object to Officer Parmertor's unfairly prejudicial testimony regarding the purportedly violent video games found in the apartment.

{¶82} For the reasons discussed above, appellant's fourth assignment of error is sustained.

{¶83} We shall next address appellant's sixth assignment of error. It alleges:

{¶84} "The trial court erred to the prejudice of the defendant-appellant in denying his motion for acquittal made pursuant to Crim.R. 29(A)."

{¶85} A "sufficiency" argument raises a question of law as to whether the prosecution offered some evidence concerning each element of the charged offense. *State v. Windle*, 11th Dist. No. 2010-L-0033, 2011 Ohio 4171, ¶25. "[T]he proper inquiry is, after viewing the evidence most favorably to the prosecution, whether the jury could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Troisi* 179 Ohio App. 3d 326, 2008 Ohio 6062 ¶9, 901 N.E.2d 856 (11th Dist.).

{¶86} In contrast, a court reviewing the manifest weight observes the entire record; weighs the evidence and all reasonable inferences; considers the credibility of

the witnesses; and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Schlee*, 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, *14-*15 (Dec. 23, 1994).

{¶87} Appellant was convicted of, inter alia, aggravated murder. That is, he was convicted of aiding and abetting in purposely causing the death of Putzbach, while committing, or attempting to commit an aggravated robbery. The relevant sections of the aggravated robbery statute provide:

{¶88} (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

{¶89} (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

{¶90} * * *

{¶91} (3) Inflict, or attempt to inflict, serious physical harm on another. R.C. 2911.01(A)(1) and R.C. 2911.01(A)(3).[1]

{¶92} Construing the evidence in the prosecution's favor, we must consider whether it was sufficient to submit the case to the jury. Although the evidence supporting the state's case was not overwhelming, we hold it was sufficient. Despite

---

1. Appellant takes issue only with his aggravated murder conviction; we therefore need not address whether evidence supported appellant's remaining convictions.

23

appellant's consistent denial of his involvement, we hold the state produced sufficient evidence.

{¶93} As discussed above, near the end of his interrogation, officers asked appellant to reiterate the details of the attack. According to appellant, Basinger loosened the chain with which he was choking the victim, and grabbed the hammer with his right hand. Appellant then stated Basinger proceeded to bludgeon the victim.

{¶94} While recounting the above details, however, appellant also made the following statement: "[Basinger] took [the hammer] out of his pocket, and then *we had pulled the dude back*, he like reached down and picked [the hammer] up." (Emphasis added.) This statement suggests he was actively involved in the attack by pulling the victim toward the rear passenger compartment of the vehicle. By making this statement, even if appellant did not mean what he said, he ultimately implicated himself in the crimes.

{¶95} Accepting the foregoing conclusion, the evidence also indicated that appellant, by his involvement in the attack, also assisted in the commission of an aggravated robbery. Appellant stated that, during the initial stages of the attack, Basinger relaxed the choke and demanded the victim to release his personal identification number on his bank account. The victim gave his assailants a number which was later proven to be an inaccurate PIN. Moreover, after the attack, appellant noted that Basinger took the victim's wallet. This evidence would permit the jury to conclude that Basinger inflicted serious physical harm with a deadly weapon while attempting to commit or for the purpose of committing a theft offense. There was therefore sufficient evidence to demonstrate appellant, due to his participation in the attack, was complicit in the aggravated robbery.

24

{¶96} For the foregoing reasons, appellant's sixth assignment of error is without merit.

{¶97} Appellant's first, second, fifth, seventh, and eighth, assignments of error provide:

{¶98} "[1.] The trial court erred to the prejudice of the defendant-appellant when it allowed the jury to view prejudicial and unreliable evidence."

{¶99} "[2.] The trial court erred to the prejudice of the defendant-appellant when it allowed the jury to hear irrelevant and prejudicial evidence."

{¶100} "[5.] The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence."

{¶101} "[7.] The trial court erred to the prejudice of the defendant-appellant by failing to merge allied offenses of similar import."

{¶102} "[8.] The trial court erred by sentencing the defendant-appellant to a term of imprisonment contrary to statute and where its findings were not supported by the record."

{¶103} Given our disposition of appellant's fourth assignment of error, appellant's remaining assignments of error are moot.

{¶104} Appellant's third and sixth assignments of error lack merit. To the extent discussed above, however, his fourth assignment of error is sustained. The judgment of the Lake County Court of Common Pleas is hereby reversed and the matter remanded for a new trial.

THOMAS R. WRIGHT, J., concurs with a Concurring Opinion,

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.

25

_____

THOMAS R. WRIGHT, J., concurs with a Concurring Opinion.

{¶105} Based upon the evidence, the jury was primarily presented with choosing between whether appellant planned or participated in the charged crimes or was a bystander.

{¶106} While the presence of one's DNA at a crime scene is often relevant in proving who committed the crime, that is not always the case. There is no dispute that Basinger, Shirer, and appellant gathered at appellant's residence prior to the incident. However, the state was unable to establish through any direct evidence that appellant planned or even knew that an attack would soon take place. Moreover, there was ample opportunity for Basinger to take the hammer from appellant's apartment unbeknownst to him. As appellant's DNA would be present on the hammer whether he planned or participated in the incident or was a bystander, it is of virtually no probative evidence in deciding his culpability.

{¶107} Regarding the marks on the ceiling, again, this evidence is of little to no probative value in determining whether appellant planned or participated in the incident or was a bystander. Assuming that the marks were made during the attack, there is virtually no evidence to establish that appellant as opposed to Basinger swung the hammer.

{¶108} Regarding Basinger carrying a roll of duct tape, this too is of little to no probative value in deciding whether appellant planned or participated in the incident. Suffice it to say that duct tape has countless uses. Few if any of us seeing someone with a roll of duct tape would conclude that criminal activity is afoot or soon to occur.

26

{¶109} Turning to the officer's statements in the video regarding Shirer's statements of appellant's culpability, while I appreciate the analysis regarding whether the statements were made for the proof of the matter asserted or otherwise, the salient fact is that the jury was not instructed or precluded from considering them for the truth of the matter asserted. Accordingly, the hearsay or nonhearsay quality of the statements is inconsequential.

{¶110} Even considering the "we" statement in the context of the police interrogation with appellant's otherwise consistent denial, based upon the totality of the evidence, appellant has demonstrated prejudice i.e., a reasonable likelihood that the outcome of the case would have been otherwise but for the admission of Shirer's statements regarding appellant's conduct. *See Strickland.*

_____

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.

{¶111} I dissent from the majority's decision to reverse and remand this matter, based on its determination that there was a *Bruton* violation and that Brown's right to a fair trial was violated. There was sufficient evidence of the crimes for which Brown was convicted to overcome any prejudice sustained by Brown as a result of his counsel's failure to object to the introduction of Detective Parmertor's comments regarding another defendant, Shirer's, statement related to Brown's involvement in the crime.

{¶112} While the majority argues that there was not sufficient evidence in this case that Brown was aware of the plan to rob and murder the victim or that he was involved in the crimes, there was evidence in the record aside from the statements of Detective Parmertor to support a holding that the inclusion of those statements did not

27

prohibit Brown from receiving a fair trial. First, Brown's DNA profile could not be excluded from the hammer allegedly used in the attack. In fact, the testimony presented was that the DNA evidence found on the hammer was "most easily explained by being" a mixture of Brown's and the victim's, and that the chances of it being different individuals' DNA would be one in five million. Further, this hammer was found in Brown's apartment and its use was consistent with the trauma to the victim's head.

{¶113} While this alone does not prove that Brown used the hammer in the attack, it is just one piece of evidence that was before the jury for its consideration, supporting a finding that there was sufficient evidence and no prejudice. It must be emphasized that "a violation of an accused's right to confrontation and cross-examination is not prejudicial where there is sufficient independent evidence of an accused's guilt to render improperly admitted statements harmless beyond doubt." *State v. West*, 8th Dist. Nos. 97391 and 97900, 2013-Ohio-96, ¶ 11, citing *State v. Moritz*, 63 Ohio St.2d 150, 407 N.E.2d 1268 (1980), paragraph two of the syllabus.

{¶114} Further, there were marks found on the ceiling near the passenger side of the vehicle where the attack occurred, which resembled the edges of a claw hammer, in the area where Brown admitted to sitting. Pictures of these marks were presented as evidence. The majority asserts that the State did not "specifically establish that the marks on the vehicle's ceiling were actually made by a hammer or made during the attack." However, there was sufficient evidence before the jury to make such a determination. The jury could conclude whether such marks appeared to be consistent with the attack and this certainly provides further support for a guilty verdict. It is also noteworthy that the victim's brother testified that he saw the victim between three to five

days a week, had been in his car fairly recently, and that the marks located on the ceiling of the passenger side of the car had not been there in the past.

{¶115} It must also be emphasized that when one of the other defendants, Basigner, exited the apartment building to meet up with the victim, he was accompanied by Brown and was carrying a roll of duct tape. This could easily support a conclusion by a jury that Brown either did know or should have known that something more than just a drug deal or meeting with a friend was about to happen.

{¶116} Although the majority states throughout its opinion that Brown denied his involvement in the crimes, it also notes that there was sufficient evidence to support his conviction, especially given his admission that "we pulled the dude back," indicating that he pulled the victim toward the rear of the vehicle. The transcript of the interview indicates that Brown pulled the victim back while Basinger was getting the hammer out of his shorts. The majority admits that such a statement "suggests that [Brown] was actively involved in the attack." *Supra* at ¶ 86. To conclude that Brown suffered prejudice through the admission of the officer's statement that Shirer stated Brown helped move the victim's body seems inconsistent and improper, given that similar, and even more incriminating, information was presented to the jury through Brown's own statement. *See State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 222 (defendant experienced no prejudice from testimony that was corroborated by other evidence in the record); *State v. Sanders*, 11th Dist. No. 2011-L-024, 2012-Ohio-400, ¶ 55.

{¶117} In addition, Brown points to nothing in the record making it clear the jury relied on the foregoing statements when reaching its verdict, especially given all of the other evidence before it. When considering all of the foregoing evidence, there was

29

sufficient independent evidence of Brown's guilt to render Detective Parmertor's statements harmless beyond doubt. There was no prejudice from Brown's attorney's failure to object to the admission of the statements in question.

{¶118} Further, regarding the *Bruton* violation itself, the State's argument that there was no *Bruton* violation at all, since Detective Parmertor's statement regarding Shirer implicating Brown in the crime was not admitted to prove the truth of the statement, but to show the reaction from Brown, has merit. It has been held that the admission of nonhearsay is not a *Bruton* violation. *United States v. Inadi*, 475 U.S. 387, 398, fn. 11, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986) (nonhearsay, including statements not introduced for the truth of the matter asserted, does not violate the defendant's right to confront witnesses). The Ohio Supreme Court has held that testimony is not hearsay, when it "explains the actions of a witness to whom a statement was directed, such as to explain the witness' activities, * * * to show a state of mind, * * * or to explain an act in question." (Citations omitted.) *State v. Maurer*, 15 Ohio St.3d 239, 262, 473 N.E.2d 768 (1984).

{¶119} As the State has argued, the statements made by Detective Parmertor were played for the jury to show how Brown acted, i.e., that Brown responded to Shirer's implicating comments, not that the comments themselves were true. It has been held by many courts that statements are admissible where they were made to elicit responses from the appellant and were not introduced to show that the statements were actually true. *State v. Dennis*, 3rd Dist. No. 9-95-9, 1995 Ohio App. LEXIS 5234, *6-7 (Nov. 22, 1995); *State v. Rice*, 11th Dist. No. 2009-A-0034, 2010-Ohio-1638, ¶ 23 (where the State did not intend to admit a statement for the truth of the matter asserted

but showed that the statement "elicit[ed] a response" from a defendant, it was not hearsay).

{¶120} Further, the majority asserts that such statements still cannot be admitted because of the response elicited and prejudice to Brown. *See State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 23 (6th Dist.) (the potential for prejudice resulting from nonhearsay statements must be considered by the court). As noted above, however, no prejudice existed in the present matter, since similar statements regarding Brown's involvement were admitted through other testimony. Based on the foregoing, it cannot be held that plain error occurred or that trial counsel was ineffective by failing to object to the admission of the statements made during Brown's interview, especially since it would be reasonable for defense counsel to accept the State's assertion that the statements were admissible nonhearsay.

{¶121} In addition, the majority notes that the testimony regarding Brown owning violent video games was improper because it could have prejudiced the jury. It provides no case law, however, to support this position. It is also noteworthy that the video games were not presented as exhibits to the jury for examination or consideration. Further, although the majority argues that, when taken in consideration with the *Bruton* violation, the admission of this testimony cannot be found to be harmless error, the foregoing arguments still apply. There was more than sufficient evidence to convict Brown of the crimes for which he was charged and, therefore, no prejudice resulted.

{¶122} Based on the foregoing, I respectfully dissent and would affirm Brown's conviction, since he suffered no prejudice from his counsel's failure to object to the admission of Detective Parmertor's comments regarding Shirer's statement.