[Cite as *State v. Aboytes*, 2020-Ohio-6806.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2020-L-001** |
| SERGIO ABOYTES, JR., | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2019 CR 000401.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, *Alexandra E. Kutz* and *Jennifer A. McGee*, Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, Ohio 44077 (For Plaintiff-Appellee).

*Noah C. Munyer* and *Jacob T. Will*, Malarcik, Pierce, Munyer & Will, 121 South Main Street, Suite 520, Akron, Ohio 44308 (For Defendant-Appellant).

MARY JANE TRAPP, J.

{¶1} Appellant, Sergio Aboytes, Jr. ("Mr. Aboytes"), appeals his convictions for three counts of rape and one count of gross sexual imposition following a jury trial in the Lake County Court of Common Pleas. The victim is Mr. Aboytes' stepdaughter, who was 10 years old at the time of the alleged offenses.

{¶2} Mr. Aboytes asserts four assignments of error, arguing that (1) he received ineffective assistance of counsel; (2) his convictions for rape were against the sufficiency

and manifest weight of the evidence; (3) the trial court erred by permitting hearsay testimony and expert witness testimony; (4) and he was denied a fair trial due to cumulative error.

{¶3} After a careful review of the record and pertinent law, we find as follows:

{¶4} (1) The trial court did not err in permitting the hearsay statements of the alleged victim and her mother because they met the excited utterance exception to the hearsay rule under Evid.R. 803(2).

{¶5} (2) The trial court did not abuse its discretion by permitting expert testimony because the testimony met the requirements of Evid.R. 702(A), and the expert prepared a written report that the state provided to defense counsel more than 21 days prior to trial pursuant to Crim.R. 16(K).

{¶6} (3) Mr. Aboytes' rape convictions were supported by sufficient evidence. In addition to the admissible hearsay statements of the alleged victim and her mother, Mr. Aboytes' statements to the police, by themselves, were sufficient to establish the element of "sexual conduct." In addition, the alleged victim's statements were sufficient to establish the element of "force or threat of force" in the context of a parent-child relationship.

{¶7} (4) Mr. Aboytes has not established that his rape convictions were against the manifest weight of the evidence by demonstrating how the jury "lost its way" in assessing the evidence.

{¶8} (5) Mr. Aboytes has not established deficient performance or resulting prejudice with respect to defense counsel's failure to assert a *Daubert* challenge to the introduction of expert testimony; to cross-examine a Spanish interpreter of Mr. Aboytes'

2

own words; to object to the order of witnesses; to object to the use of the term "victim" during voir dire; or with respect to defense counsel's trial strategy or closing argument.

{¶9} (6) Since we do not find multiple instances of harmless error, the doctrine of cumulative error is inapplicable.

{¶10} Thus, we affirm the judgment of the Lake County Court of Common Pleas.

## Substantive and Procedural History

{¶11} In April 2019, the alleged victim, D.O., was 10 years old and living in Madison, Ohio, with her mother, A.L., her stepfather, Mr. Aboytes, and her five-year-old half-brother. Mr. Aboytes had lived with A.L. and D.O. since 2012, and D.O. referred to Mr. Aboytes as "papi," which means "dad."

### The Alleged Offenses

{¶12} On the evening of April 9, the alleged victim's grandmother, S.P., received a call from A.L., who was crying hysterically and screaming. A.L. said that she came home from work and found D.O. doing chores, which was late for such activities. D.O. then informed A.L. that Mr. Aboytes had raped her.

{¶13} Within 20 to 30 minutes, A.L. arrived at S.P.'s house with the children. A.L. remained very upset and was screaming and crying. She repeated what she had previously said on the phone. D.O. was upset and her face was "puffy" from crying.

{¶14} S.P. took D.O. for a walk to a nearby park. They sat on a bench, and S.P. asked D.O. for details about what was happening with Mr. Aboytes. She recorded the conversation with her phone.

{¶15} D.O. looked down, her face got red, and she became upset. D.O. told her that Mr. Aboytes would make her go into his bedroom, take her clothes off, and get on top of his stomach and "private." Mr. Aboytes would begin counting if D.O. did not take

3

her clothes off.  D.O. stated that Mr. Aboytes would leave his boxer shorts on.  She indicated that his penis went inside her body.

{¶16}  D.O. stated that this occurred multiple times over a period of weeks or a month.  If Mr. Aboytes was not busy, he would call D.O. to his bedroom.  Each time, D.O. would be in the bedroom for up to 30 minutes.  Afterward, Mr. Aboytes would send D.O. to the bathroom to shower.

{¶17}  The next day, on April 10, S.P. and A.L. took D.O. to a hospital for a sexual assault examination.  Brittany Cianci, a sexual assault examiner ("SANE") nurse, spoke with A.L. and D.O. regarding the allegations against Mr. Aboytes.  Ms. Cianci then examined D.O. and collected samples for a sexual assault kit.   As a mandated reporter, Ms. Cianci contacted the Lake County Child Protection Services and the Madison police.

### The Investigation

{¶18}  On the evening of April 10, Patrolman Terrance Radcliffe ("Officer Radcliffe") from the Madison Township Police Department received a call from dispatch informing him about the alleged sexual offenses and that a sexual assault kit needed to be picked up from the hospital.  Officer Radcliffe drove to the Madison residence and met with A.L. and D.O.  Shortly thereafter, Detective Timothy Doyle ("Det. Doyle") also arrived.

{¶19}  Det. Doyle interviewed A.L. and D.O. in separate rooms.  The officers obtained cheek swabs from A.L., D.O., and D.O.'s half-brother and collected two pairs of female underwear that A.L. had taken from her pocket.  From the bathroom, they collected a pair of jeans, a towel, a loofah, and the top and bottom layer of garbage.  They also collected bedding from the master bedroom and, from the nightstand drawer, a watch box containing a blue sex toy and lubricant and another blue sex toy.

4

{¶20} Late in the evening on April 10, Det. Doyle interviewed Mr. Aboytes at the police department. Mr. Aboytes initially denied any sexual activity with D.O. Upon being confronted with specific allegations and when asked how many times it happened, Mr. Aboytes admitted to having sexual intercourse with D.O., saying "[w]ithin the month, maybe two, three" times beginning about "a month" or "a month and a half" prior and most recently on April 9. According to Mr. Aboytes, he was wearing red boxer shorts during the April 9 sexual encounter and used a sex toy on himself. Afterward, he told D.O. to go to the bathroom and take a shower. He also admitted that sexual touching was "probably" involved but denied that "oral" was involved.

{¶21} During the interview, Det. Doyle contacted Officer Radcliffe to collect the red boxer shorts from A.L.'s and Mr. Aboytes' residence. Det. Doyle also collected a cheek swab from Mr. Aboytes.

{¶22} During the interview, Det. Doyle left the room, and Mr. Aboytes made phone calls speaking in Spanish to his father and to A.L. Mr. Aboytes' interview with Det. Doyle and his phone calls to his father and wife were recorded by video. According to a Spanish language interpreter, Mr. Aboytes admitted to engaging in sexual activity with D.O. during both phone calls.

{¶23} Following the phone calls, Det. Doyle read Mr. Aboytes his Miranda rights, and Mr. Aboytes wrote out a statement in which he admitted that "[s]exual interco[u]rse was done. 2-3 times it happen[e]d in [his] bedroom * * *." Mr. Aboytes opted to be arrested and taken to jail.

{¶24} During the early morning hours of April 11, A.L. called S.P. hysterical, screaming, and crying and told her that Mr. Aboytes had confessed.

5

{¶25} Det. Doyle obtained the SANE kit from the hospital and submitted it and other items of physical evidence that he had collected to the Lake County Crime Lab. Testing at the lab indicated the presence of the lubricant on the crotch area of the jeans and on the pieces of toilet paper from the garbage. DNA testing performed on the red boxer shorts and on one of the sex toys indicated that D.O. and Mr. Aboytes were both likely contributors to a mixture of DNA present on the items (one hundred five billion times more likely and 2.77 million times more likely, respectively).

### The Indictment

{¶26} The Lake County Grand Jury indicted Mr. Aboytes on thirteen counts, consisting of ten counts of rape in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree (counts 1 through 6; 8 through 11), with a specification in count 4 that Mr. Aboytes did purposely compel the victim to submit by force or threat of force, and three counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), felonies of the third degree (counts 7, 12, and 13). Mr. Aboytes waived his right to be present at arraignment, and the trial court entered not guilty pleas on his behalf.

### Pretrial Matters

{¶27} Prior to commencement of trial, Mr. Aboytes, through counsel, filed three motions in limine, which the state opposed.

{¶28} In his first written motion in limine, Mr. Aboytes requested the exclusion of the testimony of the state's potential expert witness, Diane Daiber, on the grounds that she did not meet the admissibility requirements for scientific evidence set forth in Evid.R. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The trial court overruled the motion.

{¶29} In his second written motion in limine, Mr. Aboytes requested the exclusion of any hearsay statements/testimony of police officers and medical providers to establish the testimony of D.O. The trial court reserved ruling on the motion until it heard foundation testimony during trial regarding the statements.

{¶30} In an oral motion in limine, Mr. Aboytes requested the exclusion of his confession to Det. Doyle during his interview because the state would not be able to present evidence to establish a corpus delicti, i.e., the commission of the offenses, outside of the confession. The trial court overruled the motion.

{¶31} On the state's motion, the trial court dismissed six counts of rape (counts 5, 6, and 8 through 11) and two counts of gross sexual imposition (counts 12 and 13). The matter proceeded to a jury trial over three days on four counts of rape (counts 1 through 4), including the force specification in count 4, and the remaining count of gross sexual imposition (count 7, which was renumbered as count 5).

### The Jury Trial

{¶32} The state presented the testimony of S.P.; Det. Doyle and Officer Radcliffe of the Madison police; Ms. Cianci, the SANE nurse; David Green and Karen Zavarella from the Lake County Crime Lab; and Ms. Daiber, an expert witness from the International Association of Forensic Nurses. A.L. and D.O. did not appear or testify at trial.

{¶33} Over Mr. Aboytes' hearsay objections, S.P. testified regarding the content of the statements A.L. made to her during their phone conversations on April 9 and April 11 and the statements D.O. made to her at the park on April 9, and the state played the recording of S.P.'s conversation with D.O.

7

{¶34} Det. Doyle testified regarding his interview with Mr. Aboytes. Over Mr. Aboytes' corpus delicti objection, the state played a redacted version of the recorded interview.

{¶35} The recording included the phone calls in Spanish that Mr. Aboytes made to his father and A.L. Following these portions, Dennis Starkman, a Spanish language interpreter, took the witness stand and read a transcript he had prepared of Mr. Aboytes' side of the phone conversations translated into English. Upon completion, Mr. Starkman was permitted to leave without any cross-examination, and Det. Doyle retook the witness stand.

{¶36} Ms. Daiber was permitted to testify over Mr. Aboytes' objection. Topics of her testimony included the aspects of a typical sexual assault examination, the most common perpetrators of female child sexual abuse, how children respond to sexual assault, and delayed disclosure. She acknowledged that her testimony was not specific to D.O. or to the facts of the underlying case.

{¶37} The state rested subject to the admission of exhibits. Mr. Aboytes objected to several exhibits, which the trial court overruled. Mr. Aboytes moved for judgment of acquittal on all counts pursuant to Crim.R. 29, which the trial court denied. The defense rested without presenting evidence.

{¶38} Following deliberations, the jury returned guilty verdicts on three counts of rape (counts 1, 2, and 4), with a finding on count 4 that Mr. Aboytes purposely compelled D.O. to submit by force or threat of force; a guilty verdict on the remaining count of gross sexual imposition (count 7; renumbered as count 5); and a not guilty verdict on one count of rape (count 3). The trial court ordered the preparation of a victim impact statement and set the matter for sentencing.

*Sentencing*

{¶39} At the sentencing hearing, the trial court sentenced Mr. Aboytes as follows: on count 1 (rape), a mandatory indefinite prison term of 10 years to life; on count 2 (rape), a mandatory indefinite prison term of 10 years to life; on count 4 (rape), a mandatory indefinite prison term of 25 years to life; and on count 7, renumbered as count 5 (gross sexual imposition), a mandatory prison term of 48 months. The trial court ordered the sentences on counts 1, 2, and 4 to be served consecutive to each other and the sentence on renumbered count 5 to be served concurrent to the sentences imposed in counts 1, 2, and 4, for a total indefinite prison term of 45 years to life.

{¶40} The trial court further classified Mr. Aboytes as a Tier III sex offender and assessed court costs and costs of prosecution against him. It subsequently issued a judgment entry memorializing the jury verdicts and the sentences.

{¶41} Mr. Aboytes appealed and presents the following four assignments of error for our review:

{¶42} "[1.] Appellant received ineffective assistance of counsel in violation of his rights pursuant to the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

{¶43} "[2.] Appellant's conviction was against the manifest weight and sufficiency of the evidence.

{¶44} "[3.] The trial court erred in permitting hearsay testimony from multiple witnesses at trial, and in permitting the expert testimony of Diane Daiber.

{¶45} "[4.] Due to the cumulative effect of error at trial, Appellant was denied a fair trial in violation of his rights under the United States Constitution and Ohio Constitution."

{¶46} We review Mr. Aboytes' assignments of error out of order for ease of discussion.

## Hearsay

{¶47} We first address Mr. Aboytes' challenges to the trial court's evidentiary rulings.

{¶48} Within his third assignment of error, Mr. Aboytes contends that the trial court erred by permitting the admission of hearsay testimony. Specifically, Mr. Aboytes argues that A.L.'s and D.O.'s statements to S.P. did not meet the "excited utterance" exception to the hearsay rule.

### *Standard of Review*

{¶49} This court has held that whether evidence constitutes inadmissible hearsay is a question of law subject to de novo review. *Morford v. Morford*, 11th Dist. Ashtabula No. 2017-A-0044, 2018-Ohio-3439, ¶12; *see State v. Hartman*, Slip Opinion No. 2020-Ohio-4440, ¶22 (holding that the admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law subject to de novo review).

### *Excited Utterance*

{¶50} "'Hearsay' is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is not admissible except as otherwise provided in the Ohio Rules of Evidence or other relevant constitutional or statutory provisions. *See* Evid.R. 802.

{¶51} One exception to the hearsay rule is an "excited utterance" under Evid.R. 803(2), which provides as follows:

{¶52} "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:  * * * A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

{¶53} According to the Supreme Court of Ohio, "[t]he fact that this otherwise hearsay testimony is admissible is based on the notion that the excited statement maintains a high level of reliability."  *State v. Taylor*, 66 Ohio St.3d 295, 300 (1993).  "'This exception derives its guaranty of trustworthiness from the fact that declarant is under such state of emotional shock that his reflective processes have been stilled.  Therefore, statements made under these circumstances are not likely to be fabricated.'"  (Emphasis deleted.)  *Id.*, quoting McCormick, *Evidence*, Section 297 (2d Ed.1972).

{¶54} The Supreme Court of Ohio has established the following four-part test to determine the admissibility of an excited utterance (referred to in the common law as a "spontaneous exclamation"):

{¶55} "'Such testimony as to a statement or declaration may be admissible under an exception to the hearsay rule for spontaneous exclamations where the trial judge reasonably finds (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations

11

the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.'" *Id.* at 300-301, quoting *Potter v. Baker*, 162 Ohio St. 488 (1955), paragraph two of the syllabus.

{¶56} In addition, this court has held that "when determining whether a statement is an excited utterance, the court should consider: (a) the lapse of time between the event and the declaration; (b) the declarant's mental and physical condition; (c) the nature of the statement; and (d) the influence of intervening circumstances." *State v. Kalia*, 11th Dist. Trumbull No. 2002-T-0023, 2003-Ohio-4226, ¶18.

{¶57} However, the Supreme Court of Ohio has held that "[t]here is no *per se* amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may *not* be a result of reflective thought. * * * Therefore the passage of time between the statement and the event is relevant but not dispositive of the question." (Emphasis sic.) *Taylor* at 303. "'[E]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation.'" *Id.*, quoting *State v. Duncan*, 53 Ohio St.2d 215, 219-220 (1978).

### A.L.'s Statements to S.P.

{¶58} First, Mr. Aboytes contends that the trial court improperly permitted S.P. to testify regarding what A.L. told her during their phone conversation on April 9, i.e., that D.O. told A.L. that Mr. Aboytes had raped or molested her that day. According to Mr.

12

Aboytes, S.P.'s testimony contained "double hearsay" that should not have been admitted.

{¶59} We agree that this portion of S.P.'s testimony constituted "hearsay included within hearsay" but disagree that it was inadmissible.

{¶60} Evid.R. 805 provides that "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."

{¶61} This portion of S.P.'s testimony involved two levels of hearsay – D.O.'s statements to A.L. and A.L.'s statements to S.P.

{¶62} The evidence indicates that D.O. told A.L. about Mr. Aboytes' alleged conduct shortly after A.L. came home from work, which occurred shortly after the alleged offenses occurred. Mr. Aboytes has not asserted that D.O. was not under the stress of the alleged events at that time, that the lapse of time between the alleged events and D.O.'s disclosure to A.L. was problematic, or that D.O. had engaged in reflective thought before disclosing Mr. Aboytes' alleged conduct to A.L. Therefore, D.O.'s statements to A.L. regarding Mr. Aboytes' alleged conduct qualify as excited utterances under Evid.R. 803(2).

{¶63} The evidence further indicates that after D.O.'s disclosure, A.L. called S.P. at about 6:30 p.m. screaming and crying hysterically. Mr. Aboytes has not asserted that A.L. was not under the stress of hearing D.O.'s disclosure at that time, that any lapse of time between D.O.'s disclosure and A.L.'s statements to S.P. was problematic, or that A.L. had engaged in reflective thought before calling S.P. Therefore, A.L.'s statements to S.P. also qualify as excited utterances under Evid.R. 803(2).

{¶64} Since each part of the combined statements was admissible as an excited utterance under Evid.R. 803(2), S.P.'s testimony regarding A.L.'s statements during their April 9 phone conversation was admissible under Evid.R. 805. Therefore, the trial court did not err in permitting this portion of S.P.'s testimony.

### D.O.'s Statements to S.P.

{¶65} Second, Mr. Aboytes contends that the trial court improperly permitted S.P. to testify regarding what D.O. told her at the park. According to Mr. Aboytes, by taking D.O. on a private walk to the park, S.P. had "destroyed the domination of nervous excitement" over D.O.'s "reflective faculties." We disagree.

{¶66} The evidence indicates that D.O. and A.L. arrived at S.P.'s house about 20 to 30 minutes after A.L.'s phone conversation with S.P. D.O.'s eyes were red, her face was "puffy," and she was very upset. She calmed down for about ten minutes, and S.P. walked with her for about five minutes to a nearby park. They sat down on a bench, and S.P. began asking D.O. questions regarding Mr. Aboytes' alleged conduct, at which time she again became upset.

{¶67} This court and others have held that "'[t]he excited utterance exception to the hearsay rule should be applied liberally in a case involving the sexual abuse of a young child.'" *State v. Arcuri*, 11th Dist. Trumbull No. 2015-T-0123, 2016-Ohio-8254, ¶57, quoting *In re S.H.W.*, 2d Dist. Greene No. 2015-CA-25, 2016-Ohio-841, ¶22; *see State v. Craig*, 11th Dist. Lake No. 2016-L-113, 2017-Ohio-8939, ¶38 ("The requirements for the admission of an excited utterance is not applied as stringently in sexual abuse cases involving young children as it is in cases involving an adult"). In fact, the Supreme Court of Ohio has recognized that "children are likely to remain in a state of nervous excitement longer than would an adult." *Taylor* at 304. According to the court, "young

14

children" have "limited reflective powers," which "makes it likely that the statements are trustworthy." *Id.*

{¶68} In the underlying case, D.O.'s statements to S.P. were made on the same day and within hours of Mr. Aboytes' alleged conduct. This court and others have found statements made by alleged child victims after more substantial lapses of time were admissible as excited utterances. *See, e.g., State v. Ashford*, 11th Dist. Trumbull No. 99-T-0015, 2001 WL 137595, *6 (Feb. 16, 2001) (one and two days later); *State v. Chappell*, 97 Ohio App.3d 515, 521-528 (8th Dist.1994) (32 hours); *State v. Fox*, 66 Ohio App.3d 481, 488-490 (6th Dist.1990) (one day); *State v. Weigand*, 11th Dist. Lake No. 94-L-166, 1995 WL 803620, *3 (Nov. 17, 1995) (24 and 48 hours). Thus, one may reasonably conclude that D.O. was still acting under the stress of Mr. Aboytes' alleged conduct during her statements to S.P.

{¶69} Further, this court has held that "an event subsequent to the molestation can be the startling event leading to the reflexive statement." *Craig* at ¶39. Therefore, one may also reasonably conclude that D.O.'s statements to S.P. were a reaction to S.P.'s inquiry rather than a consequence of reflective deliberation. *Id.* at ¶41.

{¶70} Mr. Aboytes further contends that since S.P. asked D.O. for specific details regarding Mr. Aboytes' alleged conduct, D.O.'s statements were the product of reflective thought. Again, we disagree.

{¶71} The Supreme Court of Ohio has held that "[t]he admission of a declaration as an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous

15

excitement over the declarant's reflective faculties." *State v. Wallace*, 37 Ohio St.3d 87 (1988), paragraph two of the syllabus.

{¶72} The evidence indicates that at the park, S.P. asked D.O. to tell her what was going on regarding Mr. Aboytes. She then asked follow up questions in response to D.O.'s specific disclosures.

{¶73} Mr. Aboytes has not explained how S.P.'s questions may be construed as coercive or leading. Based on our review of the record, it appears S.P.'s questions served to initiate the conversation with D.O. regarding alleged events that she had recently experienced that day. *See Kalia, supra*, at ¶20. They were not leading or coercive, and there is nothing to indicate that S.P.'s questioning destroyed D.O.'s nervous excitement. *See id.*

{¶74} Since D.O.'s statements were admissible as excited utterances under Evid.R. 803(2), the trial court did not err in permitting this portion of S.P.'s testimony.

### *Recording of D.O.'s Statements to S.P.*

{¶75} Third, Mr. Aboytes contends that the trial court improperly permitted the state to present the recording of S.P.'s and D.O.'s conversation at the park. Since we have determined that D.O.'s statement were admissible as excited utterances under Evid.R. 803(2), the recording of their conversation was likewise admissible. Therefore, the trial court did not err in permitting the state to present it to the jury.

{¶76} The discussed portion of Mr. Aboytes' third assignment of error is without merit.

### Expert Testimony

{¶77} Within his third assignment of error, Mr. Aboytes also contends that the trial court erred by permitting the expert testimony of Ms. Daiber.

16

### *Standard of Review*

**{¶78}** "The determination of the admissibility of expert testimony is within the discretion of the trial court." *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶9. "Such decisions will not be disturbed absent an abuse of discretion." *Id.* An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶62, quoting *Black's Law Dictionary* 11 (8th Ed.Rev.2004).

### *Evid.R. 702*

**{¶79}** First, Mr. Aboytes argues that Ms. Daiber's testimony did not meet the requirements of Evid.R. 702, which provides in pertinent part, as follows:

**{¶80}** "A witness may testify as an expert if all of the following apply:

**{¶81}** "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

**{¶82}** "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

**{¶83}** "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

**{¶84}** Mr. Aboytes' arguments appear to implicate Evid.R. 702(A). Specifically, Mr. Aboytes contends that since Ms. Daiber had no knowledge of the specific facts of the underlying case, she was in no better position to explain any of the issues in the case to the jury. We disagree.

17

{¶85} It appears that the state presented Ms. Daiber's testimony to bolster D.O.'s credibility based on the nature of the allegations and the fact that she did not testify at trial.

{¶86} According to the Supreme Court of Ohio, "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *State v. Boston*, 46 Ohio St.3d 108 (1989), syllabus. However, an expert may provide testimony that supports "the truth of the facts testified to by the child, or which assists the fact finder in assessing the child's veracity." (Emphasis deleted.) *State v. Stowers*, 81 Ohio St.3d 260, 262-263 (1998). This testimony "'does not usurp the role of the jury, but rather gives information to a jury which helps it make an educated determination.'" *Id.* at 263, quoting *State v. Gersin*, 76 Ohio St.3d 491, 494 (1996).

{¶87} In addition, Evid.R. 702(A) does not require that an expert's opinion be based on facts perceived by him or her. *State v. Cook*, 11th Dist. Lake No. 2016-L-079, 2017-Ohio-7953, ¶52. This court and others have allowed experts to testify as to the common reactions of rape victims without having examined the victim. *See, e.g., id.*; *State v. Stuart*, 11th Dist. Lake No. 2018-L-145, 2020-Ohio-3239, ¶69; *State v. Moore*, 9th Dist. Medina No. 1736, 1989 WL 21233, *4-5 (March 8, 1989). The fact that Ms. Daiber did not examine D.O. was pertinent only to challenge her credibility. *Cook* at ¶52.

{¶88} Mr. Aboytes also contends that Ms. Daiber's testimony did not dispel any misconception held by the jury. Again, we disagree.

{¶89} Some of Mr. Aboytes' charged offenses involved alleged conduct that D.O did not immediately report. Thus, Ms. Daiber testified regarding delayed disclosure with respect to child victims of sexual abuse.

18

{¶90} This court has recognized that "'the fact that delayed reporting by sexual assault victims is not uncommon is not within the knowledge of the average juror.'" (Emphasis deleted.) *Cook* at ¶50, quoting *State v. Solether*, 6th Dist. Wood No. WD07053, 2008-Ohio-4738, ¶65. According to the Supreme Court of Ohio, "'[m]ost jurors would not be aware, in their everyday experiences, of how sexually abused children might respond to abuse.'" *Stowers* at 262, quoting *Boston* at 128. "'Such testimony is permitted to counterbalance the trier of fact's natural tendency to assess * * * delayed disclosure as weighing against the believability and truthfulness of the witness.'" *Id.* at 263, quoting *Gersin* at 494.

{¶91} In addition, Mr. Aboytes' charged offenses involved alleged sexual activity with his stepdaughter. Ms. Daiber testified that the most common perpetrators of child sexual abuse are "male figures associated with the mother" and explained how they utilize their access, trust, and authority to commit their offenses.

{¶92} According to the Supreme Court of Ohio, "'[i]ncest is prohibited in all or almost all cultures and the common experience of a juror may represent a less-than-adequate foundation for assessing whether a child has been sexually abused.'" *Stowers* at 262, quoting *Boston* at 128.

{¶93} Further, one of Mr. Aboytes' charged offenses alleged vaginal penetration "by force or threat of force." The average juror may expect to be presented with evidence of physical injuries to substantiate such an offense. Thus, Ms. Daiber testified that "penile penetration" does not necessarily result in visible injury. Courts have permitted expert testimony that the absence of vaginal injuries is common in sexual assault cases. *See, e.g., State v. Gardner*, 8th Dist. Cuyahoga No. 107573, 2019-Ohio-1780, ¶41, 44.

{¶94} Finally, during cross-examination of Ms. Cianci, the SANE nurse who examined D.O., defense counsel suggested that her interview of D.O. exceeded the proper scope of a medical examination, resulting in unreliable responses. Therefore, the state elicited testimony from Ms. Daiber regarding the characteristics of a typical sexual assault examination.

{¶95} According to the Supreme Court of Ohio, "[s]pecial interviewing processes are necessary to get information from child victims, who are often immature, inarticulate, frightened, and confused about the abuse they have received. Most jurors lack the knowledge of accepted practices in interviewing child victims, and expert testimony on the issue is therefore admissible." *Gersin* at 494.

{¶96} Accordingly, Ms. Daiber's testimony met the requirements of Evid.R. 702(A).

### Crim.R. 16(K)

{¶97} Second, Mr. Aboytes argues that Ms. Daiber's testimony was not admissible because she did not prepare a written report pursuant to Crim.R. 16(K), which provides:

{¶98} "An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. *Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.*" (Emphasis added.) *See State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, ¶59 (finding error in the admission of expert testimony on topics not set forth in a written report).

20

{¶99} Mr. Aboytes' assertion is belied by the record. The state's second supplemental discovery filed on August 8, 2019, which was well before the start of the jury trial on November 12, indicates that it provided defense counsel an expert report from Ms. Daiber. In addition, in his first written motion in limine, Mr. Aboytes acknowledged that the state listed Ms. Daiber as an expert witness in its supplemental discovery and "provided a report via email."

{¶100} In sum, Ms. Daiber's testimony met the requirements of Evid.R. 702(A), and she prepared a written report that the state provided to defense counsel more than 21 days prior to trial pursuant to Crim.R. 16(K). Therefore, the trial court did not abuse its discretion in permitting her testimony.

{¶101} Accordingly, the remainder of Mr. Aboytes' third assignment of error is also without merit.

### Sufficiency of the Evidence

{¶102} Within his second assignment of error, Mr. Aboytes contends that there was insufficient evidence for his rape convictions.

### *Standard of Review*

{¶103} "'"[S]ufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Id.*

{¶104} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the

21

defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

### *Sexual Conduct*

{¶105} First, Mr. Aboytes argues that the state relied solely on hearsay statements to convict him of rape. According to Mr. Aboytes, without these statements, the only remaining evidence of his misconduct was his own statements, which only proved potential sexual contact, not sexual conduct.

{¶106} Mr. Aboytes was convicted of three counts of rape in violation of R.C. 2907.02(A)(1)(b) (counts 1, 2, and 4)[1], which provides, in pertinent part, that "[n]o person shall engage in *sexual conduct* with another who is not the spouse of the offender * * *, when any of the following applies: * * * The other person is less than thirteen years of age, whether or not the offender knows the age of the other person." (Emphasis added.)

{¶107} "Sexual conduct" is defined as "vaginal intercourse between a male and female; * * * and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal * * * opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

{¶108} By contrast, "sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or,

---

1. Mr. Aboytes refers to Count 3 of the indictment, although the jury returned a not guilty verdict on this count. However, the substance of his argument demonstrates he is discussing Count 4.

if the person is a female, a breast, for the purpose of sexual arousing or gratifying either person." R.C. 2907.01(B).

{¶109} As explained above, A.L.'s and D.O.'s statements were admissible as excited utterances. However, Mr. Aboytes' statements to Det. Doyle, by themselves, were sufficient to establish the element of sexual conduct. For instance, the transcript contains the following exchange:

{¶110} "DET. DOYLE: So why don't you tell me truthfully. I'll take baby steps, the first little baby step, was there any type of activity with her? You can shake your head yes or no.

{¶111} "MR. ABOYTES: (Nodding affirmatively).

{¶112} "DET. DOYLE: Has it been going on for a little while?

{¶113} "MR. ABOYTES: (Nodding affirmatively).

{¶114} "DET. DOYLE: A couple months?

{¶115} "MR. ABOYTES: No. I'd probably say just this month.

{¶116} "DET. DOYLE: Why don't you tell me about it. Was it what I described to you? What she said to me? Be honest. When I said there was sexual intercourse?

{¶117} "MR. ABOYTES: Uh-huh.

{¶118} "DET. DOYLE: Uh?

{¶119} "MR. ABOYTES: Yeah.

{¶120} "* * *

{¶121} "DET. DOYLE: Okay. Did your penis go inside of her? Did you – did you have lubricant on?

{¶122} "MR. ABOYTES: Yeah.

{¶123} "* * *

23

{¶124} "DET. DOYLE: How many times do you think that's happened?

{¶125} "MR. ABOYTES: Within the month, maybe two, three."

{¶126} Thus, the record demonstrates Mr. Aboytes admitted to engaging in sexual intercourse with D.O., which constitutes "sexual conduct" under R.C. 2907.01(A). Therefore, there was sufficient evidence to convict Mr. Aboytes of rape under R.C. 2907.02(A)(1)(b).

### Force or Threat of Force

{¶127} Second, Mr. Aboytes argues that the state did not present sufficient evidence on the element of "force or threat of force" under count 4. According to Mr. Aboytes, the only evidence supporting this element came from S.P.'s hearsay statements where D.O. told her that Mr. Aboytes would count if she did not comply with his directives. There was no testimony that D.O. was threatened or felt she was threatened.

{¶128} Mr. Aboytes' conviction for rape under count 4 included the finding that he "purposely compelled" D.O. "to submit by force or threat of force," which mandated a prison term of 25 years to life. *See* R.C. 2971.03(B)(1)(c). "'Force' is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶129} In *State v. Eskridge*, 38 Ohio St.3d 56 (1988), the Supreme Court of Ohio announced a "relaxed standard" for showing force in the context of a parent-child relationship. *State v. Payton*, 119 Ohio App.3d 694, 702 (11th Dist.1997).

{¶130} According to the court, "'[t]he force and violence necessary in rape is naturally a relative term, depending upon the age, size and strength of the parties and their relation to each other; as the relation between father and daughter under twelve years of age. With the filial obligation of obedience to the parent, the same degree of

24

force and violence would not be required upon a person of such tender years, as would be required were the parties more nearly equal in age, size and strength.'" *Eskridge* at 58, quoting *State v. Labus*, 102 Ohio St. 26, 38-39 (1921). "'The youth and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose.'" *Id*. at 59, quoting *State v. Etheridge*, 319 N.C. 34, 47 (1987). "Because of the child's dependence on his or her parents, a child of tender years has no real power to resist his or her parent's command, and every command contains an implicit threat of punishment for failure to obey." *State v. Schaim*, 65 Ohio St.3d 51, 55 (1992).

{¶131} In recognition of "the coercion inherent in parental authority when a father sexual abuses his child," the court held that "'[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.'" *Eskridge* at 58-59, quoting *State v. Fowler*, 27 Ohio App.3d 149, 154 (8th Dist.1985).

{¶132} In the underlying case, there is no dispute that Mr. Aboytes was D.O.'s stepfather and acted as a father figure in her life. In addition, the transcript of S.P.'s conversation with D.O. at the park contains the following exchanges:

{¶133} "[S.P.] Talk to me about what has been going on. Like can you tell me a little bit about what your dad – what you said about your dad or what – what is it that's – what's going on?

{¶134} "[D.O.] So I was told to do my chores and he tells me to go in the room with him and he tells me to go on top of him.

25

{¶135} "[S.P.]  How?  Like – like on top of him how?

{¶136} "[D.O.]  Like on his stomach.

{¶137} "[S.P.]  Uh-huh.

{¶138} "[D.O.]  Like where his private is.  I told him no and he said come on or you're going to get in trouble.

{¶139} "[S.P.]  And then what do you do?

{¶140} "[D.O.]  I do it.

{¶141} "[S.P.]  With clothes on or not? No?

{¶142} "[D.O.]  He tells me to take them off.

{¶143} "* * *

{¶144} "[S.P.]  Do you take your clothes off or does he take your clothes off?

{¶145} "[D.O.]  I do 'cause he makes me.

{¶146} "[S.P.]  He makes you?

{¶147} "[D.O.]  Uh-huh.

{¶148} "[S.P.]  And is he mad when he tells you this?

{¶149} "[D.O.]  I told him no.  He – and he says take them off.  He counts and then –

{¶150} "[S.P.]  He counts?

{¶151} "[D.O.]  Uh-huh.  If I don't do it, he counts."

{¶152} As explained above, D.O.'s statements to S.P. were admissible as excited utterances.  These statements, if believed, are sufficient to establish that D.O.'s will was overcome by fear or duress as a result of an implicit threat of punishment for failure to obey pursuant to *Eskridge* and *Schaim* and thus, the element of "force or threat of force" to prove rape.

{¶153} The discussed portion of Mr. Aboytes' second assignment of error is without merit.

**Manifest Weight of the Evidence**

{¶154} Within his second assignment of error, Mr. Aboytes also contends that his rape convictions were against the manifest weight of the evidence.

{¶155} "[W]eight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶25. "In other words, a review court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.* "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶156} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin* at 175.

{¶157} Although Mr. Aboytes asserts that the jury "lost its way" in convicting him of rape, he does not state or discuss any reasons why this may be so, such as incredibility, unreliability, or contradictory or conflicting evidence that weighs against his convictions. *See, e.g., State v. Mattison*, 23 Ohio App.3d 10 (8th Dist.1985), syllabus (setting forth guidelines an appellate court may consider when weighing the evidence). As indicated,

Mr. Aboytes confessed to engaging in sexual intercourse with D.O. Therefore, Mr. Aboytes has not established that his rape convictions are against the manifest weight of the evidence.

{¶158} Accordingly, the remainder of Mr. Aboytes' second assignment of error is also without merit.

### Ineffective Assistance of Counsel

{¶159} In his first assignment of error, Mr. Aboytes contends that he received ineffective assistance of counsel.

#### *Standard of Review*

{¶160} "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction * * * has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Specifically, "the defendant must show that counsel's representation fell below an objective standard of reasonableness * * * considering all the circumstances." *Id.* at 688; *see State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus.

{¶161} The Supreme Court of the United States has held that "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland* at 689.

{¶162} "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). "There are countless ways to provide effective assistance in any given case." *Id.*

{¶163} "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. In other words, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see Bradley* at paragraph three of the syllabus.

{¶164} "Unless a defendant makes both showings, it cannot be said that the conviction * * * resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland* at 687.

{¶165} Mr. Aboytes alleges numerous prejudicial errors by defense counsel, which we review in turn.

### *Expert Testimony*

{¶166} First, Mr. Aboytes argues his defense counsel was ineffective for failing to request a *Daubert* challenge to the introduction of Ms. Daiber as an expert witness.

29

According to Mr. Aboytes, defense counsel's failure deprived Mr. Aboytes of the opportunity to challenge Ms. Daiber's scientific methods.

{¶167} In *Daubert*, *supra*, the Supreme Court of the United States held that a trial court must act as a "gatekeeper" to ensure both the relevance and reliability of expert scientific testimony before admitting it. *State v. Langlois*, 6th Dist. Lucas No. L-11-1313, 2013-Ohio-5177, ¶18. In order to aid in determining the threshold reliability of such testimony, *Daubert* identified several factors for federal district courts to consider in addressing the issue. *Id.* These factors, along with *Daubert*'s approach to the reliability issue, were later adopted by the Supreme Court of Ohio. *Id.*

{¶168} Mr. Aboytes has not demonstrated how a *Daubert* hearing would have resulted in the exclusion of Ms. Daiber's testimony. Given a proffer of Ms. Daiber's testimony in a *Daubert* hearing, the trial court could have reasonably determined that it met the requirements of Evid.R. 702(C). *Langlois* at ¶46. Thus, a motion to exclude Ms. Daiber's expert testimony on that basis would not likely have succeeded. *Id.*; *State v. Brown*, 11th Dist. Lake No. 2012-L-007, 2013-Ohio-1099, ¶34.

{¶169} Mr. Aboytes' other arguments relate to whether Ms. Daiber's testimony met the requirements of Evid.R. 702(A), which we have addressed above. As indicated, Mr. Aboytes' arguments relate to Ms. Daiber's credibility and the weight of her testimony. Defense counsel thoroughly raised these issues in his cross-examination of Ms. Daiber and in his closing argument.

### Cross-Examination

{¶170} Second, Mr. Aboytes argues that his defense counsel was ineffective for failing to cross-examine Mr. Starkman, who translated Mr. Aboytes' side of phone calls he made to his father and A.L. at the police station.

{¶171} Although it does not appear that the trial court gave defense counsel an opportunity to cross-examine Mr. Starkman, defense counsel did not object or request cross-examination.

{¶172} Counsel's decision whether to cross-examine a particular witness is a matter of trial strategy. *State v. Jackson*, 11th Dist. Ashtabula No. 2007-A-0079, 2010-Ohio-820, ¶31. Even questionable trial strategy does not compel a finding of ineffective assistance of counsel. *See State v. Smith*, 89 Ohio St.3d 323, 328 (2000).

{¶173} Further, Mr. Aboytes has not alleged that Mr. Starkman was not qualified as a Spanish interpreter or that his translation was inaccurate in any way. Therefore, he has not established that defense counsel's cross-examination of Mr. Starkman would have proved useful.

### *Order of Witnesses*

{¶174} Third, Mr. Aboytes argues that his defense counsel was ineffective for failing to object to the "unusual order" in which the state called Mr. Starkman as a witness, i.e., in the middle of Det. Doyle's testimony.

{¶175} Mr. Aboytes has cited no legal authority indicating that counsel's failure to object to the order of witnesses may constitute error.

{¶176} Evid.R. 611(A) states that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) making the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

{¶177} We see nothing unusual about the order of these witnesses' testimony. Det. Doyle testified regarding his recorded interview with Mr. Aboytes. At one point during the

interview, Det. Doyle left the room, and Mr. Aboytes made his phone calls in Spanish. Det. Doyle then returned and continued interviewing Mr. Aboytes. Thus, the state's order of witnesses was an efficient and effective way to present the recorded interview to the jury.

### Use of the Term "Victim"

{¶178} Fourth, Mr. Aboytes argues that his defense counsel was ineffective for failing to object to the use of the term "victim" and for using the term himself throughout the voir dire process.

{¶179} The Supreme Court of the United States has held that "[t]he principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 454 (1895). This principle is reflected in R.C. 2901.05(A), which provides that "[e]very person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution."

{¶180} The term "victim" means "[a] person harmed by a crime, tort, or other wrong." VICTIM, *Black's Law Dictionary* (11th Ed.2019). Depending on context, a party's use of the term "victim" at trial may imply that the charged offenses occurred, which reduces the state's burden of proof. Therefore, it is more appropriate for the parties to use the phrase "alleged victim" at trial to reflect the defendant's presumption of innocence.

{¶181} As the Tenth District has noted, courts in other jurisdictions have held that the use of the term "victim" is not the same as expressing an opinion that the defendant was guilty of crime; the term "victim" applies to anyone who suffers either as a result of ruthless design or incidentally or accidentally. *State v. Madden*, 10th Dist. Franklin No.

16AP-259, 2017-Ohio-8894, ¶30 (collecting cases). Those courts have determined that the term "victim" is used appropriately during trial when there is no doubt that a crime was committed and simply the identity of the perpetrator is in issue. *Id.* at ¶31.

{¶182} We find those cases to be distinguishable, since the issue before the jury in the underlying case was whether crimes were committed, not simply the identity of the offender.

{¶183} Mr. Aboytes cites 17 specific pages of the voir dire transcript allegedly demonstrating that the trial court, defense counsel, and the prosecutor repeatedly used the term "victim." A review of the transcript does not support Mr. Aboytes' characterization.

{¶184} In two cited pages, the prosecutor and defense counsel properly referred to "the alleged victim" in relation to the underlying case. In three cited pages, the trial court used the term while reading the indictment; however, the trial court appropriately prefaced each charge with the phrase "it is alleged." The trial court also told the prospective jurors that they may not consider the filing of the indictment for any purpose other than that it set forth the charges and informed the defendant that he was charged with the offenses.

{¶185} One cited page involves defense counsel using the term generically when inquiring of a prospective juror who had previously been a police officer; and four cited pages involve the trial court and the prosecutor using the term while inquiring whether any prospective juror had previously been a "victim" of a crime. Since the term "victim" was not used in reference to the underlying case, we do not find deficient performance on the part of defense counsel.

{¶186} Four other cited pages involve defense counsel, the prosecutor, and the trial court using the term when inquiring of a prospective juror in a hypothetical context,

33

i.e., whether, based on her disclosed personal experiences, she would need to hear from a "victim" in a sexual assault case to convict. However, this conversation occurred in chambers outside the presence of the other prospective jurors, and this individual was ultimately excused. Therefore, there could be no resulting prejudice from defense counsel's use of the term or his failure to object.

{¶187} This leaves cited three pages where the prosecutor used the term "victim" in reference to the underlying case. Specifically, the prosecutor used the term in the context of inquiring whether any prospective juror would need to hear from the "victim" to convict or would be "uncomfortable" if he or she heard there was no injury resulting from vaginal intercourse performed on the "victim."

{¶188} Even if defense counsel's failure to object constituted deficient performance, Mr. Aboytes has not established that the outcome would have been different had defense counsel objected.

{¶189} While a trial judge must remain detached and neutral in any matter before the court, a prosecutor is not constrained by any such obligation of neutrality. *State v. Nichols*, 10th Dist. Franklin Nos. 19AP-113 & 19AP-116, 2020-Ohio-4362, ¶39. And in considering the record as a whole, the prosecutor's references were isolated. The Supreme Court of Ohio has held that "[i]solated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *State v. Hill*, 75 Ohio St.3d 195, 204 (1996).

{¶190} In addition, the trial court issued several instructions prior to voir dire questioning and during the presentation of evidence. For instance, the trial court told the jury on more than one occasion that they were not to consider counsel's statements as evidence. The trial court also told the jury that Mr. Aboytes had pleaded not guilty to the

34

charged offenses, which the trial court explained was a denial of each of the charges in the indictment and put in issue all the essential elements of each offense. Prior to deliberations, the trial court explained the concepts of the presumption of innocence and reasonable doubt. We must presume that the jury followed the court's instructions. *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶147.

{¶191} Further, during the presentation of evidence, Mr. Aboytes' video-recorded interview was played for the jury, where he confessed to sexual misconduct involving D.O. Thus, it was eventually established at trial that D.O. was a "victim" of sexual abuse. At that point, the questions for the jury became whether the state had proven the elements of each of the charged offenses beyond a reasonable doubt, such as venue, "force or the threat of force," and the number of offenses.

{¶192} In support of his argument, Mr. Aboytes cites *State v. Almedom*, 10th Dist. Franklin No. 15AP-852, 2016-Ohio-1553, where the Tenth District determined that defense counsel provided ineffective assistance based, in part, on his failure to object to the prosecutor's reference to alleged child victims of sexual abuse as "victims." *Id.* at ¶4.

{¶193} We find *Almedom* readily distinguishable from the underlying matter. In *Almedom*, the Tenth District found that counsel performed deficiently in several other respects not present here, including failures to object to the trial court "consistently" referring to the children as "victims"; to ask for a mistrial or limiting instruction after the state dismissed the charge involving one of the children; to file any pre-trial motions other than a motion for a bill of particulars; to file a motion to determine the children's competency to testify; and to object to questions on direct examination and large portions of the state's evidence. *Id.* at ¶2-8.

35

{¶194} In addition, in *Almedom,* most of the offending references were made by the trial court judge, not the prosecutor, and the improper references were made throughout the entire trial. *See Nichols* at ¶39 (distinguishing *Almedom* on similar grounds).

{¶195} Further, in *Almedom*, the Tenth District found that defense counsel's conduct, linked with the trial court's and prosecutor's prejudicial comments, "undermined the proper function of the adversarial process" so that it could not "be sure a just result was produced." *Id*. at ¶10.

{¶196} Based on the record before us, there is no indication that the adversarial process was undermined or that the result was unjust.

### Trial Strategy

{¶197} Finally, Mr. Aboytes argues that his defense counsel was ineffective for failing to have a "sound trial strategy," which he characterizes as "cumulative error" on the part of defense counsel.

{¶198} Specifically, Mr. Aboytes contends that the purpose of defense counsel's oral "corpus delicti" motion in limine was "unclear" and indicated "a lack of understanding of the rules of evidence, especially in cases where alleged victims do not testify."

{¶199} However, the transcript indicates that the purpose of the motion was to preclude the admission of Mr. Aboytes' video-recorded statements to Det. Doyle, which has a recognized legal basis. The Supreme Court of Ohio has held that "[b]efore an out-of-court confession will be admitted, the corpus delicti," i.e., the act and the criminal agency, "must be established by evidence outside the confession." *State v. Van Hook*, 39 Ohio St.3d 256, 261 (1988).

{¶200} Given that Mr. Aboytes had confessed to sexual misconduct multiple times on this recording, defense counsel's wholly reasonable strategy was to attempt to exclude

36

such incriminating evidence. Rather than having "no trial strategy," defense counsel pursued a trial strategy that ultimately was not successful. Unsuccessful trial strategies do not amount to ineffective assistance of counsel. *State v. Head*, 11th Dist. Lake No. 2001-L-228, 2005-Ohio-3407, ¶65.

{¶201} In addition, Mr. Aboytes contends that defense counsel failed to set forth a "coherent argument" as why the jury should have found Mr. Aboytes not guilty on the rape offenses.

{¶202} By the time of closing argument, the trial court had overruled defense counsel's motions in limine and evidentiary objections. The jury had seen Mr. Aboytes' video-recorded confessions and heard scientific testimony regarding the DNA evidence.

{¶203} Nonetheless, defense counsel's closing argument strategy is readily apparent from the record. He questioned the reliability of the evidence and the credibility of the witnesses and specifically highlighted areas of potential reasonable doubt. And notably, the jury found Mr. Aboytes not guilty on one count of rape, which suggests counsel's argument was persuasive. Even if there was another or better strategy, that fact does not amount to counsel's breach of an essential duty to his client. *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980).

{¶204} In sum, we conclude that Mr. Aboytes has not established deficient performance on the part of defense counsel or resulting prejudice.

{¶205} Mr. Aboytes' first assignment of error is without merit.

**Cumulative Error**

{¶206} In his fourth and final assignment of error, Mr. Aboytes contends that he was denied a fair trial as a result of cumulative error.

{¶207} Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). In other words, if this court finds various errors to be harmless error, we may reverse based upon the effect of all of these harmless errors together. *State v. Donkers*, 170 Ohio App.3d 509, 2007-Ohio-1557, ¶202 (11th Dist.).

{¶208} The doctrine is not applicable to this case as we do not find multiple instances of harmless error. *See Garner* at 64.

{¶209} Mr. Aboytes' fourth assignment of error is without merit.

{¶210} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is affirmed.


TIMOTHY P. CANNON, P.J.,

THOMAS R. WRIGHT, J.,

concur.